ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X
                                    :
    UNITED STATES OF AMERICA        :
                                    :
        - v. -                      :    SUPERSEDING INDICTMENT
                                    :
    ARIF NAQVI,                     :    S6 19 Cr. 233 (LAK)
    WAQAR SIDDIQUE,                 :
    RAFIQUE LAKHANI,                :
    MUSTAFA ABDEL-WADOOD,           :
    ASHISH DAVE, and                :
    SIVENDRAN VETTIVETPILLAI,       :
                                    :   ┌─────────────────────────────┐
     Defendants.                    :   │ USDC SDNY                   │
                                    :   │ DOCUMENT                    │
- - - - - - - - - - - - - - - - - -X   │ ELECTRONICALLY FILED        │
                                        │ DOC #:                      │
                                        │ DATE FILED:    5|23|19      │
                                        └─────────────────────────────┘

COUNT ONE

(Racketeering Conspiracy)

The Grand Jury charges:

Background

1.    At all times relevant to this Indictment, ARIF NAQVI,
WAQAR SIDDIQUE, RAFIQUE LAKHANI, MUSTAFA ABDEL-WADOOD, and ASHISH
DAVE, SIVENDRAN VETTIVETPILLAI, the defendants, and others known and
unknown were employees and leaders of the Abraaj Group, a global
private equity business.

2.    In or about 2002, ARIF NAQVI, the defendant, founded
the Abraaj Group as a private equity firm focused on investments in
emerging markets in the Middle East and North Africa ("MENA")
regions. The Abraaj Group marketed itself as a trailblazer in

emerging markets investing and as a pioneer of so-called "impact investing," the practice of making investments calculated to generate beneficial social outcomes.

3.   In 2012, the Abraaj Group acquired Aureos Capital, a private equity firm founded by SIVENDRAN VETTIVETPILLAI, the defendant. By acquiring Aureos Capital, the Abraaj Group obtained investment funds with geographic concentrations in Latin America, Sub-Saharan Africa, and South East Asia. The Abraaj Group continued to solicit investments from individuals and institutions around the globe, with an increasing focus on attracting investors from the United States.

4.   By in or about early 2018, the Abraaj Group boasted of being the largest private equity firm in the world focused on emerging markets. The Abraaj Group employed more than 290 persons and maintained offices in eighteen countries, including in the United States. As of January 2018, The Abraaj Group publicly reported that it managed more than $13 billion in assets across its various funds. The Abraaj Group intended to grow larger: in 2017, the Abraaj Group announced its plans to raise a new $6 billion fund, APEF VI.

5.   In reality, however, by at least in or about 2014, the Abraaj Group was not the success story it portrayed itself to be. The Abraaj Group's legitimate business activities could not produce and maintain the cash flow and cash reserves necessary to conduct basic, day-to-day functions, such as funding certain promised

acquisitions in its private equity funds, making payments on its debt, maintaining compliance with applicable capital and liquidity regulations, and covering payroll costs and operating expenses, among other things.

6.     After a series of anonymous reports of impropriety, negative news articles, and inquiries from concerned investors, in or about 2017 and early 2018, the Abraaj Group's ability to conceal its true financial condition faltered. The Abraaj Group ceased to be able to service its debt as agreed, it ceased to be able to raise additional funds from investors or lenders, and it ceased to be able to cover its operating expenses. By in or about June 2018, the Abraaj Group had collapsed into insolvency: the Abraaj Group's holding company and the Abraaj Group's management company each filed for provisional liquidation in the Cayman Islands.

7.     As of May 23, 2019, entities and individuals have asserted losses, in aggregate, of over $1 billion against the Abraaj Group's holding company and the Abraaj Group's management company.

### The Abraaj Enterprise

8.     The Abraaj Group constitutes an "enterprise" as defined in Title 18, United States Code, Section 1961(4), that is a group of entities and individuals associated in fact. The Abraaj Enterprise ("Abraaj Group," "Abraaj Enterprise," the "Enterprise" or "Abraaj") consisted of business entities operating under the Abraaj Group brand, individuals employed by business entities operating

under the Abraaj Group brand, and others known and unknown, and included the following individuals and entities:

a.   ARIF NAQVI, WAQAR SIDDIQUE, RAFIQUE LAKHANI, MUSTAFA ABDEL-WADOOD, ASHISH DAVE, and SIVENDRAN VETTIVETPILLAI, the defendants.

b.   Abraaj Investment Advisors Limited ("AIML"), a Cayman Islands-formed entity that served as the management entity for more than 40 different Abraaj private equity funds.

c.   Abraaj Holdings Ltd. ("Abraaj Holdings"), a Cayman Islands-formed entity that served as a holding company and owner of AIML.

d.   Abraaj North America LLC ("Abraaj North America"), a U.S. company that the Abraaj Group used to operate in the United States and through which the Abraaj Group employed approximately a dozen U.S.-based investment professionals and maintained an office in Manhattan, New York.

e.   Abraaj Capital Limited ("ACLD"), a United Arab Emirates-based Abraaj Group entity regulated by the Dubai Financial Services Authority.

f.   Abraaj Private Equity Fund IV ("APEF IV"), a more than $1 billion private equity fund launched in or about 2008 and closed in or about 2012 that principally focused on buyout and growth investments in the Middle East, North Africa, and South Asia regions.

g.   The Abraaj Growth Markets Healthcare Fund (the "Healthcare Fund"), an approximately $1 billion private equity fund launched in 2015 and closed in 2016 that focused on healthcare industry investments in emerging markets.

h.   Abraaj Infrastructure Growth and Capital Fund ("IGCF"), an approximately $2 billion private equity fund launched in or about 2006 and closed in or about 2007 that focused on infrastructure projects in the Middle East, North Africa, and South Asia regions.

i.   ASAS fund, an approximately $100 million private equity fund launched in or about 2010 and closed in or about 2016 that focused on long-term commercial real estate investments, particularly in the MENA region.

j.   Abraaj Private Equity Fund VI ("APEF VI"), a private equity fund for which the Abraaj Group solicited investments between 2016 and 2018. The Abraaj Group marketed APEF VI as a global emerging markets fund, as opposed to a regional fund and, by late fall 2018, boasted that it had secured more than $3 billion in investor commitments.

9.   The Abraaj Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purposes of achieving the objectives of the enterprise. The Abraaj Enterprise operated in the Southern District of New York and elsewhere. The Abraaj Enterprise was engaged in, and its activities

affected, interstate and foreign commerce.

10.   The Abraaj Enterprise structured most of its private equity funds as separate limited partnerships, such that an Abraaj-branded entity acted as a general partner, another Abraaj-branded entity acted as manager, and investors acted as limited partners. The Abraaj Group typically placed its partnership interests under the control and ownership of Abraaj Holdings. The Abraaj Group typically centralized its fund management activities through AIML.

11.   Each limited partnership arose from a limited partnership agreement ("LPA") that specified, among other things, the lifespan of the fund, the fund's investment objective, and the participants' respective financial commitments to the fund. Pursuant to the various LPAs, the Abraaj fund manager would receive fees for its work and the Abraaj general partner would receive a percentage of the investment profits, known as "carried interest" or "carry," if the fund's investments were successful. At certain times, other entities within the Abraaj Group also participated in private equity funds as limited partners.

12.   While investors in Abraaj funds typically committed at the outset of the partnership to provide a certain amount of money to the partnership, they did not provide all of this funding at once. Pursuant to the various LPAs for the funds, the Abraaj general partner or manager had to request that investors transfer monies to the investment fund. The general partners' funding demands to investors-

—known as "drawdowns" or "drawdown notices"--were supposed to delineate how the Abraaj fund manager was going to use the investors' money. The general partner or manager in each fund was also typically required to periodically update the limited partners on the fund's investments.

### The Defendants Corrupt the Abraaj Enterprise

13.  By at least 2014, ARIF NAQVI, WAQAR SIDDIQUE, RAFIQUE LAKHANI, MUSTAFA ABDEL-WADOOD, ASHISH DAVE, and SIVENDRAN VETTIVETPILLAI, the defendants, and certain other senior executives of Abraaj (the "Abraaj Leadership") corrupted the Abraaj Enterprise. At NAQVI's direction, and using the resources and reach of the Abraaj Enterprise's international infrastructure and reputation, the defendants pursued criminal activities in the United States and across the globe, including numerous acts of securities fraud, wire fraud, and money laundering.

14.  Through their criminal conduct, ARIF NAQVI, WAQAR SIDDIQUE, RAFIQUE LAKHANI, MUSTAFA ABDEL-WADOOD, ASHISH DAVE, and SIVENDRAN VETTIVETPILLAI, the defendants, deceived and defrauded existing and potential investors in the United States and elsewhere, including United States financial institutions, United States retirement and pension funds, United States investment advisors, a United States philanthropic foundation, and an agency of the United States Government; enriched themselves at the expense of their investors and business partners; and caused hundreds of millions of

dollars in losses to investor-victims.

15.   The conduct of ARIF NAQVI, WAQAR SIDDIQUE, RAFIQUE LAKHANI, MUSTAFA ABDEL-WADOOD, ASHISH DAVE, and SIVENDRAN VETTIVETPILLAI, the defendants, and others, precipitated the largest collapse of a private equity firm in history.

<u>The Roles of the Defendants</u>

16.   ARIF NAQVI, the defendant, was at all times relevant to this Indictment the founder and leader of the Abraaj Enterprise. NAQVI exercised ultimate authority within the Abraaj Enterprise, including over the Abraaj Leadership's criminal activities, and personally involved himself in efforts to deceive investors and potential investors, to raise money through false and misleading statements and omissions, to collect and conceal the proceeds of the Abraaj Leadership's schemes, and to conceal these activities from investors and regulators.

17.   WAQAR SIDDIQUE, the defendant, was at all times relevant to this Indictment a managing partner of the Abraaj Enterprise. In his capacity as the Director of Operations at the Abraaj Enterprise, SIDDIQUE also managed the conduct of other members of the Enterprise. Working under the direction of ARIF NAQVI, the defendant, since Abraaj's founding, SIDDIQUE promoted the Abraaj Leadership's criminal ambitions and concealed their illicit activities, including by executing the orders of ARIF NAQVI, the defendant, to misappropriate funds and to overvalue the Abraaj

Enterprise's investment positions.

18.   RAFIQUE LAKHANI, the defendant, was at all times relevant to this Indictment a vice president of the Abraaj Enterprise and the Abraaj executive with day-to-day responsibility for managing the Enterprise's cash flow. Pursuant to the directives of ARIF NAQVI, the defendant, LAKHANI managed the Abraaj Enterprise's cashflow to promote the criminal activities of the Abraaj Leadership, including by funneling investor monies out of Abraaj funds, into intermediate accounts controlled by the Enterprise, and then diverting those monies to the Abraaj Leadership or using those monies to cover liquidity shortfalls within the Abraaj Enterprise.

19.   MUSTAFA ABDEL-WADOOD, the defendant, was at all times relevant to this Indictment a managing partner at the Abraaj Enterprise and the executive with primary responsibility for overseeing Abraaj's investments in the MENA region. ABDEL-WADOOD misused the Enterprise to promote the criminal activities of the Abraaj Leadership, including by approving false valuations of investment positions held in various Abraaj funds, including APEF IV.

20.   ASHISH DAVE, the defendant, was at certain times relevant to this Indictment the Abraaj Group's Chief Financial Officer. In that role, DAVE misused the Enterprise to promote the criminal activities of the Abraaj Leadership in numerous ways, including approving numerous false filings and reports provided to

investors, financial institutions, and regulators.

21.   SIVENDRAN VETTIVETPILLAI, the defendant, was at all times relevant to this Indictment a managing partner of the Abraaj Enterprise and the executive with primary responsibility for overseeing Abraaj's impact investment projects, including the Healthcare Fund. As discussed below, VETTIVETPILLAI misused the Enterprise to promote the criminal activities of the Abraaj Leadership in numerous ways, including by conveying false information to investors about the use of their invested funds.

<u>The Defendants Secretly Raid Abraaj's Investment Funds</u>

22.   The Abraaj Enterprise faced repeated liquidity crises in the years before its collapse. Beginning in at least 2014, certain members of the Enterprise, including RAFIQUE LAKHANI, the defendant, had responsibility for updating ARIF NAQVI, the defendant, and others, on at least a monthly basis, on the details of Abraaj's perilous financial position. From at least 2014 to 2018, LAKHANI, and those working with him, maintained charts and spreadsheets reflecting, among other things, payments due, cash on hand, anticipated inflows, and anticipated shortfalls, which he then regularly sent or caused others to send by email to NAQVI and others, including, at various times, WAQAR SIDDIQUE, MUSTAFA ABDEL-WADOOD, and ASHISH DAVE, the defendants. In cover emails providing these updates, LAKHANI repeatedly alerted NAQVI, SIDDIQUE, ABDEL-WADOOD, and DAVE about the dire financial position of Abraaj and sought

advice.

23.     Instead of disclosing the truth about Abraaj's poor financial health, ARIF NAQVI, the defendant, directed others within Abraaj to pursue a variety of strategies to misappropriate cash from investors and to use it to fund cash shortfalls, thereby concealing Abraaj's true condition from investors, potential investors, creditors, and regulatory authorities. These deceptive strategies included (a) extracting cash from existing investment funds without the permission or knowledge of the investors who contributed those funds; (b) delaying distributions owed to existing investors and using those distributions for other, unapproved purposes; (c) delaying the planned deployment of investor capital without the permission or knowledge of the investors who contributed those funds; and (d) otherwise using investor capital for purposes other than the purposes for which the Abraaj Leadership had represented it would be used, such as to cover Abraaj's payroll and debt service.

24.     The Abraaj Leadership's use of investor monies was inconsistent with representations made to investors both prior to conveying their capital to Abraaj and after they did so. Investors typically participated in Abraaj funds as limited partners and pursuant to an LPA. While the precise terms of the various LPAs differed, each LPA included terms that restricted the Abraaj Leadership's ability to use investor funds for unauthorized purposes. More generally, investors in Abraaj's private equity funds were not

investing in Abraaj Holdings or AIML, but rather in specific private equity funds, and investor commitments were not made for Abraaj's general use.

25. Even though investors had not agreed to permit the Abraaj Leadership to transfer their monies out of the particular fund entities into which they invested, members of the Enterprise made, or caused the making of, such unauthorized transfers. Moreover, ARIF NAQVI, WAQAR SIDDIQUE, MUSTAFA ABDEL-WADOOD, and RAFIQUE LAKHANI, the defendants, frequently corresponded about their plans to address the cash crisis at Abraaj by misappropriating investor monies that were supposed to be used for particular investments and diverting those monies to pay expenses having nothing to do with those investments.

26. For example, in an email sent on or about January 9, 2014, an Abraaj Group employee ("Employee-1") alerted ARIF NAQVI, WAQAR SIDDIQUE, MUSTAFA ABDEL-WADOOD, and RAFIQUE LAKHANI, the defendants, that "We will have a deficit of $100m by 15th Jan[.]" and that "[t]he cash balance by mid-March . . . will be negative US$5M and need to be covered by APEFIV/ASAS inflows," a reference to the use of misappropriated investor funds from APEF IV (and another fund, ASAS) in order to fund a liquidity shortfall elsewhere at Abraaj.

27. In a March 2, 2014 email, Employee-1 alerted ARIF NAQVI, WAQAR SIDDIQUE, MUSTAFA ABDEL-WADOOD, and RAFIQUE LAKHANI, the defendants, among others, that approximately $19.6 million was

required to repay investors in another Abraaj fund and that Abraaj did not have the funds. According to LAKHANI, the Abraaj Leadership's only option was to raid APEF IV: "We cannot pay this until further inflows come in from APEFIV investors . . . ." The same email referenced efforts to persuade two banks to "upsize" existing credit facilities in order to create cash, but cautioned that, "[g]iven the critical cash position, we will be unable to pay the [bank] instalment [sic] of US$25M. APEFIV/ASAS fund raising are key to seeing the month through as [the banks] are unlikely to upsize during this month."

28.   The looting of APEF IV was not limited to obtaining funds to repay investors. Members of the Abraaj Enterprise also used APEF IV funds to meet regulatory capital requirements for other Abraaj entities. For example, in a March 18, 2014 email, Employee-1 alerted ARIF NAQVI, WAQAR SIDDIQUE, MUSTAFA ABDEL-WADOOD, and RAFIQUE LAKHANI, the defendants, among others, that taking $25 million from a new APEF IV investor was "critical to be able to restore regulatory cash balances in ACLD and MCM at quarter-end" and to attempt to make a required distribution to another investor.

29.   By in or about May 2015, Abraaj's cash deficits had grown substantially and, by the Abraaj Leadership's own accounting, totaled approximately $219 million. To conceal the truth about Abraaj's finances, members of the Abraaj Enterprise began to systematically sweep all available cash--from any source and without regard to fund structure or use limitations—into the centralized

control of the Abraaj Leadership, to be dispatched in accordance with the Abraaj Leadership's priorities. The largest target of the Abraaj Leadership's repeated misappropriation of investor funds was APEF IV, one of Abraaj's largest funds, with over $1 billion in cash and assets. Over the ensuing months and years, members of the Abraaj Enterprise repeatedly siphoned investor monies from APEF IV to solve time-sensitive liquidity issues. In response to a February 27, 2016 email from RAFIQUE LAKHANI, the defendant, seeking direction on how to address a shortfall of approximately $2.4 million, ARIF NAQVI, the defendant, exemplified this perspective, asking: "We can't pull some cash from APEF 4?"

30. In part to obtain additional capital, in or about 2014 and 2015, members of the Abraaj Enterprise solicited investments in various Abraaj-branded funds from the clients of an asset manager and financial advisor based in Pennsylvania (the "U.S. Investment Advisor"). The U.S. Investment Advisor served a global client base, but approximately half of its clients were located in the United States and many of those clients were United States employee retirement or pension funds, including a particular retirement fund for New York State employees and a particular retirement fund for professional musicians, as well as funds for employees of the states of Texas, Washington, Louisiana, and Hawaii.

31. In or about July 2014, the U.S. Investment Advisor hosted a meeting of Abraaj personnel at its offices in the United

States to discuss potential investments on behalf of its clients in one or more Abraaj funds and to conduct due diligence about Abraaj. ARIF NAQVI and SIVENDRAN VETTIVETPILLAI, the defendants, among others, personally attended this meeting. During the meeting, NAQVI made numerous representations regarding Abraaj's historical performance, its loss ratio, and its internal rate of return. Unbeknownst to the U.S. Investment Advisor, many of NAQVI's statements were materially false and misleading. NAQVI also omitted to state that Abraaj faced a liquidity crisis.

32.   By in or about 2015, and based in part on the false representations made by ARIF NAQVI and SIVENDRAN VETTIVETPILLAI, the defendants, the U.S. Investment Advisor agreed to invest at least $150 million of its clients' assets with Abraaj, including assets of certain United States retirement and pension funds. The U.S. Investment Advisor acquired partnership interests in five separate Abraaj funds, including IGCF and APEF IV, and made its capital contributions through an investment vehicle created specifically to facilitate the U.S. Investment Advisor's investment in multiple Abraaj investment funds.

33.   The infusion of cash from the U.S. Investment Advisor did not resolve Abraaj's liquidity crisis. On or about March 28, 2016, RAFIQUE LAKHANI, the defendant, relayed in an email to ARIF NAQVI, MUSTAFA ABDEL-WADOOD, WAQAR SIDDIQUE, the defendants, and Employee-1, in part, "We will be able to survive the month only, if

15

we borrow $16m from APEF IV to cover $8m payable to [bank] and $8m for [a required] regulatory deposit." In the same message, LAKHANI estimated the amount of funds transferred out of APEF IV now stood at $219.65 million.

34.   In an email to ARIF NAQVI, the defendant, dated May 3, 2016, WAQAR SIDDIQUE, the defendant, underscored the gravity of the liquidity crisis: "All of this adds up to additional cash requirement of US$ 194m before June 30th. . . . Don't see any other inflows and only two months left to resolve this . . . . Obviously, this must be on your mind but highlighting the critical timeline— perhaps Rafique, Mustafa, you and I should meet."

## Abraaj Raises $1 Billion for the Healthcare Fund, Which It Then Raids

35.   In 2015, Abraaj launched the Healthcare Fund which promised to invest in hospitals and diagnostic centers in high-need, low-income cities in developing countries. The Healthcare Fund attracted investments of nearly $1 billion, anchored by a $100 million investment from a U.S. philanthropic foundation headquartered in Seattle, Washington (the "U.S. Foundation"), and investments from multiple other U.S. businesses.

36.   The Healthcare Fund stopped accepting new primary investors in late 2015. By in or about August 2016, members of the Abraaj Enterprise turned to raiding the Healthcare Fund as a source of cash to effectuate the scheme to deceive investors, creditors and

the public about Abraaj's true financial condition.

37. On August 7, 2016, in response to another email about projected negative cash balance from RAFIQUE LAKHANI, the defendant, MUSTAFA ABDEL-WADOOD, the defendant, wrote: "We should also drawdown [the Healthcare Fund]. Arif has mentioned to Sev [SIVENDRAN VETTIVETPILLAI, the defendant] yesterday." The next month, members of the Abraaj Enterprise sent a drawdown notice to Healthcare Fund investors instructing those investors to send approximately $12.7 million to the Healthcare Fund and detailing how the majority of the funds would be used to fund particular healthcare-related transactions.

38. As requested in the drawdown notice, the U.S. Foundation and the other investors transferred approximately $12.7 million to the Healthcare Fund. The U.S. Foundation and other U.S. investors transferred their monies to the Healthcare Fund through bank accounts maintained in the United States.

39. Although the Healthcare Fund investors expected that their funds would be used as described in the drawdown notice, more than $10 million of those funds were instead funneled to accounts affiliated with AIML, and then diverted to recipients wholly unrelated to the Healthcare Fund. For example, the Abraaj Leadership dispatched more than $4 million of Healthcare Fund monies to certain Abraaj offices, including to Abraaj's office in Manhattan, New York to cover payroll and operational expenses. By first transferring

investor monies to AIML, the Abraaj Leadership concealed the nature and source of the funds when it subsequently transferred them to other business units and investors. In addition to deploying investor monies elsewhere within the Abraaj Enterprise, members of the Enterprise caused the wiring of more than $500,000 to a private entity under the functional control of ARIF NAQVI, the defendant (the "Naqvi Personal Entity").

40.   Just two months later, in November 2016, members of the Abraaj Enterprise sent a second drawdown notice to Healthcare Fund investors, again delineating particular investments in specified hospital and diagnostic centers for which these funds would be used. Healthcare Fund investors honored the request by wiring monies to bank accounts associated with the Healthcare Fund. Instead of being used as described on the drawdown notice, at least $70 million of the funds were misappropriated, funneled through an account affiliated with AIML, and ultimately used for purposes entirely unrelated to the Healthcare Fund, including $3.2 million that was were wired directly to ARIF NAQVI, the defendant, or to the Naqvi Personal Entity.

41.   In or about March 2017, members of the Abraaj Enterprise issued a third drawdown notice to Healthcare Fund investors, this time requesting $115 million. The drawdown notice again delineated particular healthcare investments for which these funds would be used. Healthcare Fund investors, including the U.S.

Foundation, honored the request by wiring monies to bank accounts associated with the Healthcare Fund. Certain members of the Abraaj Enterprise immediately misappropriated at least approximately half of the funds: In May 2017, Abraaj funneled more than $35 million of investor monies out of the Healthcare Fund to AIML and used them for a variety of unapproved purposes, including a $1.5 million transfer to the Naqvi Personal Entity.

42.    Even with the millions misappropriated from the Healthcare Fund, Abraaj Holdings and AIML still verged on insolvency. In a May 31, 2017 email exchange between ARIF NAQVI and RAFIQUE LAKHANI, the defendants, LAKHANI wrote:

> As you are aware, I am under tremendous pressure re Abraaj cash as well, there is a serious cash crunch and currently I don't have the funds to pay essential payments like salaries for the month of June. You are fully aware of the situation. Turkey team is putting pressure for repayment of capital call facility, how we will fund [the Healthcare Fund] deals, don't know if we will be able to fund, [Foreign Sovereign Pension Fund] payment, [a particular bank] MTM continuously negative for month [of] May paid $5m, Supplier payments and the list goes on. As an example, just now received funding request from [an Abraaj executive], generally we pay around 5th of the month. Don't know how do I manage. I humbly and respectfully request you to please help me in this situation. The tension and stress is unbearable for me and it is affecting my health and my efficiency, and performance at work. I don't know what else to say.

43.    Members of the Abraaj Enterprise turned to yet another United States investor to fill the gap. In addition to the initial investors in the Healthcare Fund, Abraaj also sought and obtained

$150 million in debt financing for the Healthcare Fund from an agency of the United States Government (the "U.S. Agency") that facilitates American business investments in emerging markets. To obtain financing from the U.S. Agency, Abraaj executed a financing agreement that included, in substance and among other terms, a restriction that the U.S. Agency's financing could only be used for fund investments and for certain fees and expenses related to the fund. The Abraaj Leadership also provided the U.S. Agency with due diligence materials that, among other things, concealed Abraaj's true financial condition and its misuse of investor monies.

44.   On or about August 18, 2017, members of the Abraaj Enterprise issued the U.S. Agency a disbursement request for approximately $68 million to be paid by September 18, 2017. The U.S. Agency honored the request by wiring monies from a bank account in New York, New York to a bank account associated with the Healthcare Fund. RAFIQUE LAKHANI, the defendant, promptly informed ARIF NAQVI, WAQAR SIDDIQUE, and ASHISH DAVE, the defendants, that "We will also receive $68m from [the U.S. Agency] for [the Healthcare Fund]" so "Total cash available would be $124.5m," and identified that the Abraaj Leadership could use the total amount to pay, among other things, debt unrelated to the Healthcare Fund, Abraaj payroll expenses, and distributions to investors in other funds. The Abraaj Leadership, in fact, used those funds and, by in or about October 2017, once again faced pressing cash shortfalls.

The Defendants Misappropriate Cash for Their Personal Benefit

45.    While   the   misappropriation   of   investor   cash temporarily covered liquidity shortfalls, such theft did not solve the fundamental problem that Abraaj was not the success the Abraaj Leadership claimed it to be. A significant impediment to Abraaj's success   was   that   members   of   the   Abraaj   Enterprise   used misappropriated   and   fraudulently   obtained   funds   for   improper purposes, including to enrich themselves.

46.    ARIF NAQVI, the defendant, transferred, and caused others to transfer, more than $250 million dollars of misappropriated funds to accounts under his control or under the control of his family members or personal associates.

47.    ARIF NAQVI, WAQAR SIDDIQUE, RAFIQUE LAKHANI, MUSTAFA ABDEL-WADOOD,   ASHISH   DAVE,   and   SIVENDRAN   VETTIVETPILLAI,   the defendants, also used investor funds to pay themselves in the form of partnership distributions, salaries, and bonuses. For instance, between in or about 2011 and 2018, ABDEL-WADOOD received at least $8 million in salary and bonuses, and SIDDIQUE received at least $7 million in salary and bonuses; and between in or about 2012 and 2018, VETTIVETPILLAI received at least $4.8 million in salary and bonuses. NAQVI, SIDDIQUE, LAKHANI, ABDEL-WADOOD, DAVE, and VETTIVETPILLAI continued to collect these payments even when investors had not received their promised distributions, when Abraaj was not making investments it had represented it would make, and when Abraaj was

running substantial deficits.

48.   For example, on or about May 31, 2017, in response to concerns from RAFIQUE LAKHANI, the defendant, about the availability of cash, ARIF NAQVI, the defendant, directed LAKHANI to ignore those concerns and transfer funds to a member of NAQVI's family and to a company run by NAQVI's former secretary: "Take a deep breath, smile, say Alhamdulillah and proceed [t]o send $300,000 dollars to [first name of NAQVI's family member] in his U.K. Account and $300,000 dollars to the [company of former secretary] account. Both are broke, need the cash tomorrow." Alhamdulillah translates to "Praise be to god."

49.   The Abraaj Leadership's pilfering of money from APEF IV, IGCF, the Healthcare Fund, and the other Abraaj funds exacerbated Abraaj's declining performance and reputation.

50.   For example, misappropriation from the Healthcare Fund meant that Abraaj was unable to actually fund the Healthcare-related transactions for which investors has specifically committed their capital to the Healthcare Fund in the first place. In a September 18, 2017 email to ARIF NAQVI, the defendant, RAFIQUE LAKHANI, the defendant, requested NAQVI's "help in delaying" three Healthcare Fund investments in order to ensure that cash could be used as part of the Abraaj Leadership's misappropriation scheme. The Abraaj Leadership similarly delayed promised investments in other funds, too, in order to free up the cash for other purposes.

51.  In addition, misappropriation of the proceeds of successful investments meant that Abraaj was unable to timely disburse the proceeds of investments to investors who were entitled to them. On July 19, 2016, MUSTAFA ABDEL-WADOOD, the defendant, emailed ARIF NAQVI, WAQAR SIDDIQUE, and RAFIQUE LAKHANI, the defendants, informing them that investors in a particular Abraaj fund were beginning to grow disgruntled because a periodic investor report had previously promised a distribution that Abraaj was now unable to fund. ABDEL-WADOOD proposed to talk to LAKHANI about how to avoid drawing additional scrutiny: "Will speak to you offline but need revised dates for LP distributions so we can manage and deflect the pressure that is happening and also I suspect it is creating internal rumbles."

52.  On certain occasions, the Abraaj Leadership withheld from investors the fact that Abraaj had completed, or exited, a particular investment, and thus that Abraaj owed a distribution of proceeds to the investors. The Abraaj Leadership withheld this information in order to use the proceeds for other, unapproved purposes.

### The Defendants Employ Bribery

53.  At the direction of ARIF NAQVI, the defendant, members of the Abraaj Enterprise also bribed Pakistani elected officials for the benefit of the Enterprise.

54.  For example, in June 2016, ARIF NAQVI, the defendant,

authorized the payment of USD$20 million to a particular official in Pakistan ("Politician-1") with connections to two senior elected officials ("Politican-2" and "Politican-3") purportedly to engage Politician-1 as "a transaction advisor" and to "specifically focus[] on the approvals, consents and various agreements that will be required from the Government of Pakistan and its related entities" for a transaction involving Abraaj, KES Power Limited, or K-Electric Limited. KES Power Limited was a holding company for K-Electric Limited, an electrical energy utility in Pakistan, in which various Abraaj-branded entities invested approximately $300 million.

55.   In his email personally approving the agreement and payment, ARIF NAQVI, the defendant, directed a senior member of Abraaj ("Executive-1") to "please remove references to KES, KE and Abraaj and keep it generic; send it to him from your gmail. This document is explosive in the wrong hands. Do not consult any advisors further on it." By "KES" and "KE," NAQVI referred to Karachi Electric Services and Karachi Electric, respectively.

56.   Executive-1 followed the guidance of ARIF NAQVI, the defendant, and prepared a revised version of the agreement that omitted almost all of the identifying information from the initial drafts of the agreement, including the name of Politician-1 and references to Karachi Electric. By September 4, 2016, Abraaj, through AIML, executed the agreement to retain a particular entity as an advisor "in connection with a potential Transaction . . . involving

24

Holdco Limited ('Holdco') or Opco Limited ('Opco')" in exchange for the payment of USD$20 million. In truth and in fact, the agreement was nothing more than a conduit through with Politician-1 could use Abraaj cash to influence Politician-2 and Politician-3 in connection with Abraaj's plans to sell its stake in Karachi Electric, over which the government of Pakistan had leverage. Indeed, prior to signing the agreement, Politician-1 reported to Executive-1 that Politician-1 would get the "blessings" of Politician-2 and Politician-3 "as well as their instructions as to how this money should be distributed (e.g. a portion to charity OR a portion to the election fund kitty etc etc)."

57.   For further example, between at least 2013 and 2016, ARIF NAQVI, the defendant, at times assisted by RAFIQUE LAKHANI and WAQAR SIDDIQUE, the defendants, used Abraaj funds to pay bribes to another Pakistani elected official ("Politician-4") and to cover certain dining and travel expenses of Politician-4. NAQVI also arranged for Abraaj or a business controlled by Abraaj to employ a relative of Politician-2. As NAQVI explained by email to SIDDIQUE in 2016, "[Politician-2] is a friend (and we 'look' after him from time to time)."

Defendants Convey False Representations to Investors Whose Funds
                    Had Been Misappropriated

58.   To avoid exposing the fact that the Abraaj Leadership was operating the Enterprise criminally and stealing investor funds,

members of the Abraaj Leadership (a) provided materially false and misleading drawdown notices to investors, (b) provided materially false and misleading reports to investors about the status of their investments, (c) deflected inquiries from investors who posed questions over delays in the receipt of promised distributions or the status of investments, and (d) issued materially false and misleading denials when asked by concerned investors about potential improprieties.

59.   Between at least in or about 2014 and 2018, members of the Abraaj Enterprise disseminated false and misleading drawdown notices to investors, purporting to request investor funds for one purpose when, in truth and in fact, members of the Enterprise intended to use the funds for another purpose.

60.   As part of their fund management activities, Abraaj's general partner and management components were also obliged to provide written updates about each fund to that fund's investors, including to the investors in APEF IV, the Healthcare Fund, and IGCF. These updates purported to advise investors about Abraaj's outlook, Abraaj's fundraising, and Abraaj's new investments, among other things.

61.   At times, members of the Abraaj Enterprise intentionally withheld disseminating these periodic updates to certain investors, including investors in APEF IV and IGCF, in order to conceal what the Abraaj Leadership was doing with investor funds.

Indeed, by at least October 2016, Abraaj employees provided MUSTAFA ABDEL-WADOOD, the defendant, with a "[l]ist of investors with whom GP Reports have not been shared." That list also noted that "APEF IV and ASAS Q1 & Q2 2016 reports have not been shared with the investors who are yet to receive the distributions."

62.    Further, as a result of the Abraaj Leadership's misappropriations, the periodic reports that Abraaj did provide to investors through its general partner and management entities contained numerous materially false and misleading statements and omissions. Between in or about 2014 and in or about 2018, Abraaj management entities disseminated multiple periodic reports to investors—including its investors in the United States—that omitted that (a) Abraaj faced a liquidity crisis, (b) various Abraaj-branded entities had overdue loans, (c) Abraaj had delayed planned capital deployments due to undisclosed cash shortages, and (d) the Abraaj Leadership had used fund-specific investor monies for non-fund purposes.

63.    For example, in or about September 2017, an Abraaj general partner entity disseminated a "Report of the General Partner," for the period ending June 30, 2017, to APEF IV investors (the "GP Report"). The GP Report included a "Fund Status" table that reported, among other things, "committed capital" and monies "available for drawdown." These figures were materially false and misleading in that they suggested that APEF IV had deployed capital

only to specified projects and held un-deployed investor monies in the fund. In truth and in fact, as discussed above, hundreds of millions of investor funds had been transferred out of the fund structure to Abraaj Holdings, AIML, or elsewhere. Further, in the same report, the Abraaj general partner omitted to state that Abraaj had been using APEF IV investor funds to cover payroll, borrowing, and operating expenses for Abraaj Holdings and other components of Abraaj.

64.   Until the fall of 2017, certain members of the Abraaj Enterprise had successfully been able to diffuse investor inquiries about the use of funds. One strategy utilized by ARIF NAQVI, the defendant, to shut down investor questions was to highlight Abraaj's reputation and relationship with the U.S. Foundation, and to claim to be offended when investors ventured to ask probing questions.

65.   For example, in or about September 2017, certain investors in Abraaj funds received an anonymous email (the "Warning Email") warning investors about potential misappropriation at Abraaj: "Cash is used to fund the working capital of Abraaj and easy to audit. Abraaj fund 4 is the biggest sufferer and has funded the Abraaj Holdings balance[]sheet for years." In a written response, ARIF NAQVI, the defendant, stated that he "categorically reject[s] this slanderous allegation. . . . [I]t is bizarre and frankly unintelligible for anyone to insinuate that the group would be using LP money for working capital." Among others, NAQVI sent this

representation to limited partners in the United States, including employees of the U.S. Investment Advisor. In truth and in fact, NAQVI's denial was false, and the Warning Email was exactly right: At NAQVI's direction, the Abraaj Leadership had been looting APEF IV for years to cover expenses incurred in other areas of Abraaj.

66. Also in or about September 2017, certain other investors raised significant concerns about what the Abraaj Leadership was doing with the investor monies it had drawn down. Specifically, certain investors in the Healthcare Fund focused on the fact that more than $200 million of investor monies that had drawn down between September 2016 and March 2017 appeared not to have been deployed as expected.

67. In an email dated September 12, 2017, a representative for the U.S. Foundation ("U.S. Foundation Employee-1"), emailed a junior Abraaj employee assigned to the Healthcare Fund, expressing concern about the disconnect between the capital drawn down and the capital actually invested, as reflected by Abraaj's periodic reports, noting that "[t]here seems to be an extraordinary amount of money sitting in the fund for quite an extended period of time." U.S. Foundation Employee-1 pressed for "details on where those funds are located and how they are current[ly] invested."

68. By September 20, 2017, ASHISH DAVE, the defendant, after having been alerted to the U.S. Foundation's inquiry, made a proposal to WAQAR SIDDIQUE and RAFIQUE LAKHANI, the defendants, and

ultimately to ARIF NAQVI, the defendant, about how the Abraaj Leadership should attempt to assuage the Healthcare Fund investors. DAVE suggested that the Abraaj Leadership respond to the request for bank records by providing a letter (the "Confirmation") from a bank utilized by the Healthcare Fund to an auditor used by Abraaj. The Confirmation purported to confirm that, as of June 30, 2017, there was $224 million in specified Abraaj Healthcare Fund accounts (the "Healthcare Accounts") held at that institution. Following DAVE's suggestion, Abraaj employees working on the Healthcare Fund provided the Confirmation to certain of the Healthcare Fund investors, including the U.S. Foundation.

69.    The Confirmation was highly misleading. Two days before the June 30, 2017 confirmation date, the Healthcare Accounts, which had held only approximately $13 million, received wires totaling approximately $196 million from accounts affiliated with an airline company (the "Airline") for which ARIF NAQVI, the defendant, was a director. Days later, after the snapshot date reflected on the Confirmation, the $196 million was wired back out of the Healthcare Accounts to the same external accounts, again leaving the Healthcare Accounts with a fraction of the funds.

70.    Notwithstanding the fact that the Healthcare Fund no longer had custody of the approximately $196 million in purportedly un-deployed investor funds, various members of the Abraaj Enterprise, including ARIF NAQVI and SIVENDRAN VETTIVETPILLAI, the defendants,

repeatedly assured investors in the Healthcare Fund that their money was sitting safely in the Healthcare Accounts and simply had not been deployed because, among other false excuses offered by NAQVI and VETTIVETPILLAI, of regulatory delays.

71.   By November 30, 2017, a representative of the U.S. Foundation, on behalf of a group of Healthcare Fund investors, requested "an update on the actual use of the funds from the period beginning on November 24, 2016 through November 30, 2017" and actual bank statements for accounts in which the contributed funds have been held. SIVENDRAN VETTIVETPILLAI, the defendant, responded, in part, "I have just landed in London from Nairobi and I know Dubai is closed for religious festivities until next Tuesday and hence most people tend to take this opportunity to take the week off. As soon as people are back [Abraaj] will deal with this request." VETTIVETPILLAI's response was misleading, however, because he had separately written ARIF NAQVI, the defendant, among others, and the group was already plotting a response. NAQVI directed VETTIVETPILLAI to keep the request quiet, writing "Let's not forward to ANYONE internally yet please." NAQVI then proposed to ASHISH DAVE, WAQAR SIDDIQUE, and RAFIQUE LAKHANI, the defendants, that they obtain the funds from the Airline again: "[The Airline] is easy to give us 100 on Monday into a designated account for a week to enable a certificate to be sent; with the balance from the 50, Can we make it work? Ie show more as spent?"

31

72.   On December 8, 2017, SIVENDRAN VETTIVETPILLAI, the defendant, wrote representatives of the largest Healthcare Fund investors, including the U.S. Foundation, and explained that the Healthcare Fund had significant un-deployed capital because "we were running [the Healthcare Fund] like a company with a corporate structure, in which capital is paid up, and deployed as per the directions of the company's board, and where cash balances retained for long periods of time is normal." VETTIVETPILLAI attached to his message an "AGHF Fund Deployment Schedule" that contained false and misleading statements about how and when investor funds had been used. VETTIVETPILLAI did not, however, disclose to investors that (a) members of the Enterprise had worked for days to reverse-engineer the deployment schedule to match Abraaj's drawdown notices and investment committee minutes and (b) investor funds had not been sitting idly in "a corporate structure," as VETTIVETPILLAI suggested, but had been used for non-Healthcare Fund purposes, as VETTIVETPILLAI well knew. Nor did VETTIVETPILLAI provide Healthcare Fund investors with bank account records to back up his false assertions that investor funds had not been misused.

73.   When the Healthcare Fund investors asked again for the bank account records showing activity in the Healthcare Fund accounts, members of the Abraaj Enterprise changed tactics. An Abraaj employee responded to the investors, copying SIVENDRAN VETTIVETPILLAI, the defendant, stating that Abraaj would "immediately

arrange to return $95.5 million to you, along with the disbursements from [the U.S. Agency] that related to the approved investments." Abraaj thereafter wired monies back to Healthcare Fund investors. But even this repayment was not what it seemed. Because members of the Abraaj Enterprise had misappropriated significant portions of the Healthcare Fund, the Enterprise had to borrow or transfer approximately $195 million from multiple other parties in order to replace what the Abraaj Leadership had taken from the Healthcare Fund. Certain of these parties subsequently asserted loss claims against AIML, or Abraaj Holdings, or both, after those entities filed for provisional liquidation.

74. Members of the Enterprise repeatedly offered false excuses--such as invoking regulatory delays to the Healthcare Fund investors--in order to justify late payments to creditors or late disbursements to investors. Among other false excuses, members of the Enterprise misleadingly attributed delays to bank holidays, religious holidays, the travel plans of its executives, and counterparty error.

75. For example: By on or about November 30, 2017, Abraaj owed a particular country's pension fund (the "Foreign Sovereign Pension Fund") an installment payment of more than $5 million. In response to a reminder about the deadline, ARIF NAQVI, the defendant, asked ASHISH DAVE and RAFIQUE LAKHANI, the defendants, "What obfuscation ideas can you come up with to delay this by a few weeks?"

DAVE then supplied a proposed response to the Foreign Sovereign Pension Fund, suggesting that they falsely assert that "we have had a delay in closing an exit." That false explanation was then transmitted by LAKHANI to representatives of the Foreign Sovereign Pension Fund, copying, among others, NAQVI, DAVE, and MUSTAFA ABDEL-WADOOD, the defendants.

76.   ARIF NAQVI, the defendant, and other members of the Abraaj Enterprise used false statements and misleading accounting subterfuge as part of their efforts to keep investors and creditors from discovering the truth about Abraaj's dismal financial condition. As NAQVI wrote to RAFIQUE LAKHANI, the defendant, on or about June 29, 2017, in the context of a particular deceptive transaction, "It's a bit like playing poker[.]"

### The Defendants Attempt to Conceal the Fraud and Promote the Enterprise by Launching a $6 Billion Fund

77.   By in or about early 2017, Abraaj remained in a dire financial position: more than $200 million had been misappropriated from APEF IV, another approximately $100 million had been misappropriated from the Healthcare Fund, and Abraaj was still failing to make promised investments, distributions, and payments to lenders.

78.   Rather than disclose the truth about Abraaj to investors and others, ARIF NAQVI, the defendant, and other members of the Abraaj Leadership announced a plan to raise $6 billion for a

new global investment fund, APEF VI.

79. To attract U.S. institutional investors, Abraaj concentrated its APEF VI marketing operations in its Manhattan, New York office, and recruited a particular U.S.-based investor relations professional ("CC-1"), a co-conspirator not named as a defendant herein, to lead the fundraising effort. CC-1 called and met with at least dozens of potential investors in the United States. As part of the marketing push, ARIF NAQVI, WAQAR SIDDIQUE, the defendants, a partner at Abraaj with responsibilities that included investment valuation ("CC-2"), who is a co-conspirator not named as a defendant herein, and other members of the Abraaj Enterprise, also traveled to the United States to promote the fund and to meet with existing investors in other Abraaj funds, including investors in APEF IV and the Healthcare Fund, and potential APEF VI investors, including in Manhattan, New York.

80. In addition to failing to disclose the material fact that the Abraaj Leadership had been serially misappropriating funds from investors in prior funds, the marketing and due diligence materials conveyed false information regarding Abraaj's performance "track record" in various Abraaj-branded funds in order to deceive prospective investors and fraudulently induce them into committing capital to Abraaj's latest generation of funds, most notably APEF VI. Abraaj's marketing materials and periodic investor reports asserted that Abraaj valued its funds pursuant to the International

Private Equity and Venture Capital Valuation ("IPEV") guidelines. In truth and in fact, the Abraaj Leadership valued its positions however necessary to support its claims of success.

81.    The marketing and due diligence materials reflected a deliberate decision by ARIF NAQVI, WAQAR SIDDIQUE, RAFIQUE LAKHANI, MUSTAFA ABDEL-WADOOD, SIVENDRAN VETTIVETPILLAI, ASHISH DAVE, the defendants, and CC-2, to inflate, or "uplift" as they described it, the valuations listed in the firm's track record. While members of the Enterprise had intentionally overvalued certain Abraaj investments over time, by in or about 2016 and 2017, Abraaj Leadership had increased the frequency and magnitude of its overvaluations in order to induce new investor commitments in APEF VI and to induce the purchase of certain limited partnership interests in existing Abraaj-branded funds to new investors in secondary transactions.

82.    ARIF NAQVI, the defendant, with the support of RAFIQUE LAKHANI, WAQAR SIDDIQUE, MUSTAFA ABDEL-WADOOD, ASHISH DAVE, and SIVENDRAN VETTIVETPILLAI, the defendants, and CC-2, sought such an "uplift" or inflation of the valuation of positions in Abraaj private equity funds, despite strong resistance from lower level Abraaj employees familiar with the companies being valued. For example:

- In an August 1, 2017 email from SIDDIQUE to NAQVI, SIDDIQUE noted that he had "initial feedback from [CC-2], [and] the valuations are not moving the directions we require. Rafique [LAKHANI] and Ashish [DAVE] will be sitting with [CC-2] during this week."

- On August 3, 2017, [CC-2] sent an email to ABDEL-WADOOD stating: "[W]e sat with Arif on valuations and have the proposed changes." Another individual working with CC-2 and ABDEL-WADOOD then sent an email to NAQVI (copying CC-2 and ABDEL-WADOOD) on August 6, 2017 providing updated valuations reflecting "total uplift from the numbers we had [l]ast week [of] $44m . . . bringing total uplift in [v]aluation at US$160m vs US$120m earlier." The email then noted the positive impact the changes would have to the track record being used to market APEF VI.

- On August 7, 2017, NAQVI forwarded the August 6, 2017 email containing the "uplift numbers" to CC-2, LAKHANI and DAVE asking: "Is this sufficient? What more do we need to get into the safe zone." DAVE, Abraaj's CFO, forwarded the email to his controller, directing him to "plug in" the enhanced valuation numbers into the marks provided to existing and prospective investors.

- The same day, DAVE sent an email to NAQVI, CC-2, and LAKHANI stating that, "based on these valuations"-- meaning, the uplifted valuations--"we have projected profit of $240k for the year," a reference to the management revenue generated by fees charged to investors in existing funds, such as APEF IV, based on the inflated valuations. CC-2 then responded that VETTIVETPILLAI had indicated that a "$5 m[illion] uplift" could be added to the valuation of positions in the Healthcare Fund.

83. One of the Abraaj investments that received a valuation "uplift" in the August 6, 2017 numbers was in a particular company held by APEF IV ("Investment-1"). On August 6, 2017, a junior member of the deal team involved in the Investment-1 transaction emailed MUSTAFA ABDEL-WADOOD, the defendant, copying the junior member's direct bosses, both partners in Abraaj's MENA region, including a particular employee ("Employee-2"). The junior member responded in opposition to the request that Investment-1 be

valued at 1.4x cost, by noting, among other points, that another well-known private equity fund had Investment-1 marked at .7 to .8x cost. Employee-2 responded: "We need to bring valuation down to cost."

84.   MUSTAFA ABDEL-WADOOD, the defendant, forwarded the email chain to ARIF NAQVI, the defendant. The next day, August 7, 2017, NAQVI sent a related email to ASHISH DAVE, RAFIQUE LAKHANI, WAQAR SIDDIQUE, and MUSTAFA ABDEL-WADOOD, the defendants, and CC-2. The email criticized members of the deal teams who had suggested write-downs and directed that no such markdowns should be taken, in part because NAQVI needed the higher valuations to generate profits. NAQVI wrote:

> Bring Mustafa into this loop, copied here. He needs to own the MENA team and let them understand the big picture and why we are being pushy. Even little things like writing down [Investment-1] should be a no no, and we should reflect our aspirations in the others. I need a minimum of 20-25 mm profit at [Abraaj Holdings] in order to keep this effing business afloat and show strength to the banks.

85.   To further promote the criminal activities of the Abraaj Leadership, members of the Abraaj Leadership, including ARIF NAQVI, WAQAR SIDDIQUE, MUSTAFA ABDEL-WADOOD, the defendants, and CC-2, ignored the views of the transaction team. Instead, the Abraaj Leadership used inflated or "uplift" valuations for

Investment-1 and other investments to both value Abraaj's existing funds and to calculate the track record used to market APEF VI.

86.   After ARIF NAQVI, the defendant, directed MUSTAFA ABDEL-WADOOD, the defendant, to quiet the junior team members who had been suggesting write-downs, ASHISH DAVE, the defendant, and ABDEL-WADOOD met to review the valuations in the MENA portfolio. After the meeting, DAVE sent an email to NAQVI, RAFIQUE LAKHANI, WAQAR SIDDIQUE, the defendants, and CC-2 and ABDEL-WADOOD. The email noted the additional "uplift" amounts that had been added to particular funds and the resulting positive impact this would have on Abraaj's profits.

87.   In or about October 2017, as a result of the numerous misrepresentations Abraaj had made about its performance and financial health, Abraaj announced a successful near-$3 billion "first close" for APEF VI. This announcement came two months after the directive of ARIF NAQVI, the defendant, to use the "uplift" numbers for the APEF IV track record.

88.   The committed investors to APEF VI included numerous United States investors, such as clients of the U.S. Investment Advisor, clients of U.S. financial institutions, and certain U.S. employee retirement and pension funds, such as funds for certain employees of Texas, Washington, Louisiana, and Hawaii.

89.   That Abraaj had been systematically reporting false valuations was known throughout Abraaj's management ranks. For

example, in an electronic message sent to two other senior members of the Abraaj Enterprise on or about September 26, 2017, SIVENDRAN VETTIVETPILLAI, the defendant, observed that he and the other senior managers gave credence to otherwise suspicious valuations, writing: "It is people like us that give credibility to characters such as Arif because the investors know that Arif is a strong character but at the same time they think we are probably will not support those kinds of things and since we front of them confirm what bullshit that Arif says they are ignoring their own instinct." For further example, a particular executive ("Executive-2") remarked to MUSTAFA ABDEL-WADOOD, the defendant, on or about December 28, 2017, for example, "It's fraud. Simple. Misrepresentation plus the whole healthcare thing amplified that fraud and brought it out." ABDEL-WADOOD responded, "Even beyond that."

90.   After Abraaj publicly announced that it had raised nearly $3 billion for APEF VI, ARIF NAQVI, the defendant, started formulating a plan for how the Abraaj Leadership could gradually bring the inflated valuations down after the APEF VI investment funds had been drawn down and obtained, and without alerting investors to the fact that they had been misled. In December 2017, NAQVI informed CC-1 that Abraaj would ultimately need to take substantial valuation write downs of positions used in the APEF IV track record. Shortly thereafter, in a January 4, 2018 email chain,

NAQVI, MUSTAFA ABDEL-WADOOD and SIVENDRAN VETTIVETPILLAI, the defendants, and CC-1 and CC-2, discussed their agreement to delay disclosing the need for write-downs until after APEF VI fundraising had been completed.

91. In the initial email in the chain, ARIF NAQVI, the defendant, delineated more than $500 million in specific write-downs in portfolio company valuations for Q4 2017 (the "Markdown List"). NAQVI acknowledged that a significant number of the over-marked positions had been utilized as part of the "track record" of returns being shown to prospective investors in APEF VI and asked that "the email and decisions [] not be circulated outside this group at present."

92. On January 6, 2018, CC-1 responded to the email of ARIF NAQVI, the defendant, providing three potential scenarios for how to handle the needed write-downs and their impact on APEF VI fundraising. CC-1 concluded by stating, among other things, that "[t]o be more brief/blunt, if we take these write downs and announce them on our usual end of year schedule, I do believe it will have a negative influence on later stage investors for APEF VI and could derail some of them . . . ."

93. On January 8, 2018, ARIF NAQVI, the defendant, asked the remaining recipients--including MUSTAFA ABDEL-WADOOD, and SIVENDRAN VETTIVETPILLAI, the defendants, and CC-2--to provide responses to this "very fundamental impact this decision w[ill]

have on all sorts of issues." On January 11, 2018, VETTIVETPILLAI responded with a focus on the impact of such disclosures on APEF VI fundraising. VETTIVETPILLAI stated that because Abraaj is "in the market raising [a] lot of capital," the firm should "give ourselves a bit of room to collect [a] bit more money" before making the necessary disclosures. VETTIVETPILLAI noted that to do the entire write-down in one quarter would "not be wise" because it could result in "a feeling by investors, existing and new/potential, that they have been misled by artificially inflating the valuation." As a result, VETTIVETPILLAI suggested that the write-downs can be taken "over two quarters and the relative impact [will be] smoothened as much as possible."

94.    In other words, SIVENDRAN VETTIVETPILLAI, the defendant, proposed that Abraaj delay making more than $500 million in necessary write downs until after they had secured additional contractually-committed investors for fund APEF VI.

95.    The Abraaj Leadership put this scheme into action, delaying the write-downs to avoid impairing APEF VI fundraising, which remained ongoing, and agreeing to implement the write-downs in stages over at least two quarters to soften the impact of the news and smooth out the performance decreases, lowering the valuations part of the way in one quarter and lowering them further in the next.

96.   On or about January 19, 2018, approximately one week after the last email in the January 2018 email chain described above, ARIF NAQVI, the defendant, led a meeting of Abraaj partners, including MUSTAFA ABDEL-WADOOD and SIVENDRAN VETTIVETPILLAI, the defendants, and CC-2. During the meeting, NAQVI explicitly discussed the inflated marks and the need to keep them inflated while Abraaj raised money for APEF VI.

97.   In addressing questions related to valuation and write-offs, ARIF NAQVI, the defendant, stated, as memorialized in an audio recording of the meeting:

> And, and there's one more thing. There's one more thing which is very important. Which is we could not have done it before now. [*Naqvi laughs quietly, and continues laughing quietly as he begins the next sentence.*] We just could not have done it before now. Because to do it before now, is to chop your own legs off while you're involved in running [*UI*] the race. Right? [*Chuckling*]. And that's just stupid, right? So, every time I get an email from you or someone, saying "This valuation is indefensible," I just do like this, because you know what, at the end of the day there are just some things that we have to carry forward until the time is right. And the time is right now. Okay.

98.   At another point in the meeting, ARIF NAQVI, the defendant, stated, as memorialized in an audio recording:

> But the reality is that this is an outcome of an enormous [*UI*] among a lot of very senior people in the firm. And actually I think it's

43

important to hear them debate, in summary. And
the debate in summary is that at some point
we've got to take these markdowns, because
they are [UI], frankly, erroneous, if we
continue to carry a [Company-1] at 45. If we
continue to carry [Company-2] when we
ourselves know that we have to sell it at a
price x.

### Abraaj Collapses

99.  Notwithstanding the fact that each of ARIF NAQVI,
WAQAR SIDDIQUE, RAFIQUE LAKHANI, MUSTAFA ABDEL-WADOOD, SIVENDRAN
VETTIVETPILLAI, ASHISH DAVE, the defendants, CC-1 and CC-2 were
aware that the Abraaj Leadership was reporting inflated valuations
to investors, the Abraaj Leadership continued to fundraise, and
cause others to fundraise, for APEF VI based on its performance
track record using the old (and knowingly false) valuations. In
fact, Abraaj's fundraising efforts ended only on February 16, 2018,
following news articles about misappropriation misconduct at the
firm. The articles prompted widespread interest and alarm. Abraaj
abandoned its efforts to raise money for APEF VI and released
investors who had committed capital.

100. By in or about March 2018, ARIF NAQVI, the defendant,
had stepped down as CEO of Abraaj in response to public pressure and
other executives began to examine the company's books and records.

101. On or about March 1, 2018, RAFIQUE LAKHANI, the
defendant, alerted ARIF NAQVI, the defendant, that "[an auditor] is
coming at 3pm" and advised him that they needed to speak in person,

"I would like to come and see at your home." In the same message exchange, NAQVI informed LAKHANI "I will send my driver to pick up the boxes for [the Naqvi Personal Entity], how many boxes are there?" After LAKHANI confirmed he had packed up nine boxes, NAQVI added, "OK pls make sure [the driver] takes the boxes out from the door near accounts and not the main reception and there is a trolly in which he can load quite a few at one time so have the trolly loaded."

102.   Later, on or about March 12, 2018, RAFIQUE LAKHANI, the defendant, alerted ARIF NAQVI, the defendant, that two executives (Executive-1 and another executive "Executive-3") had requested information that would reveal some of the funds NAQVI had extracted from Abraaj for himself: "As discussed I will be providing [Executive-1] and [Executive-3] [financial statements] of AIML for 31 Dec 2017." LAKHANI explained that he would hide the transfers as best he could: "Your balance is appearing under your name. I will move this receivable amount to [Abraaj Holdings] and therefore your account will have zero balance in AIML. However bank statement of AIML which also has been requested by them will show transfers to [the Naqvi Personal Entity] and to you (where the funds were sent to you directly). Pls let me know if it's OK to share bank statement starting from July 2017?" NAQVI responded, "Wait."

103. Even as late as April 2018, ARIF NAQVI, the defendant, expressed doubt that any financial regulatory authority would hold him or the other members of the Abraaj Enterprise responsible for

their conduct. In an April 11, 2018 telephone call between NAQVI and CC-1 intercepted pursuant to a judicial order, the following conversation occurred:

> NAQVI:  As I predicted from the outset, no one will start an inquiry when your primary regulatory's making the inquiry, that is the protocol that all regulators follows, and they said look we're under pressure so we're asking process driven questions, and the eventual outcome is going to be in our opinion X and do you want to make it short or do you want to make it long, it was a very very useful and constructive conversation.
>
> CC-1:  Wow. Wow.
>
> NAQVI:  None of which involves anybody getting fucked, none of which involves anybody getting damaged. And it's what I've been saying all along. The regulator will act as a shield and will come together for the benefit for global emerging markets, the reputation of the country, and Abraaj. Abraaj is (Crosstalk)
>
> CC-1:  Wow. . .

104. In June 2018, both Abraaj Holdings and AIML filed for liquidation.

105. In the wake of Abraaj's collapse, various entities

have asserted substantial losses against AIML and/or Abraaj Holdings in an aggregate amount of over $1 billion. Among them, APEF IV has asserted a loss of approximately $300 million and IGCF has asserted a loss of approximately $78 million.

106. In public remarks, press releases, and statements by his representatives following Abraaj's 2018 collapse, ARIF NAQVI, the defendant, attributed the collapse, in part, to unexpected breaches of partnership agreements by investors and by unanticipated transaction delays. Contrary to these representations, Abraaj's collapse did not relate to mere transaction delays or unexpected investor behavior. In truth, NAQVI, along with, WAQAR SIDDIQUE, RAFIQUE LAKHANI, MUSTAFA ABDEL-WADOOD, ASHISH DAVE, and SIVENDRAN VETTIVETPILLAI, the defendants, and other members of the Abraaj Leadership carried out a sustained series of criminal acts of fraud and deceit at the expense of Abraaj's investors, creditors, and counterparties.

## Statutory Allegations

### The Racketeering Conspiracy

107. From at least in or about 2014, up to and including in or about April 2018, in the Southern District of New York and elsewhere, ARIF NAQVI, WAQAR SIDDIQUE, RAFIQUE LAKHANI, MUSTAFA ABDEL-WADOOD, ASHISH DAVE, and SIVENDRAN VETTIVETPILLAI, the defendants, and others known and unknown, being persons employed by and associated with the enterprise described above, namely, the

47

Abraaj Enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate the racketeering laws of the United States, to wit, Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Abraaj Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple:

       a.   Acts involving fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5;

       b.   Acts indictable under Title 18, United States Code, Section 664 (relating to embezzlement from pension and welfare funds).

       c.   Acts indictable under Title 18, United States Code, Section 1343 (relating to wire fraud);

       d.   Acts indictable under Title 18, United States Code, Section 1344 (relating to financial institution fraud);

       e.   Acts indictable under Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments).

108. It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the Enterprise.

### Purposes of the Racketeering Conspiracy

109. The principal purpose of the racketeering conspiracy was to seek, obtain and retain investor funds through materially false representations and omissions in order to enrich the members of the Enterprise and to mask the declining financial condition of Abraaj's legitimate business.

110. A further purpose of the racketeering conspiracy was to maintain and increase the industry standing, public reputation, and political influence of the Enterprise, generally, and its leader, ARIF NAQVI, the defendant, specifically, which enhanced the Enterprise's ability to seek and obtain investor funds.

111. A further purpose of the racketeering conspiracy was to conceal the Abraaj Leadership's criminal conduct from investors, regulators, creditors, business counterparties, and the public.

### Means and Methods of the Racketeering Conspiracy

112. ARIF NAQVI, WAQAR SIDDIQUE, RAFIQUE LAKHANI, MUSTAFA ABDEL-WADOOD, ASHISH DAVE, and SIVENDRAN VETTIVETPILLAI, the defendants, sought to advance the purposes of the racketeering conspiracy, and to conduct and participate, directly and indirectly, in the Abraaj Enterprise, through various unlawful means and methods, including:

a.   Certain defendants misappropriated investor monies that had been conveyed to fund particular private equity projects, instead diverting these funds to themselves, to their associates, and to other Abraaj-branded businesses to cover undisclosed shortfalls and expenses. As a practical matter, the Abraaj Enterprise principally accomplished this misappropriation through the use of wire transfers, including transfers designed to conceal the source and destination of misappropriated funds, and through accounting subterfuge.

b.   Certain defendants intentionally misled investors about the status of their investments and the use of their money. Members of the Abraaj Enterprise disseminated marketing materials containing false and misleading statements in order to obtain investor commitments. Further, to prompt the transfer of investor monies to Abraaj-managed funds, Abraaj issued false and misleading drawdown notices to investors. Further still, Abraaj provided investors false and misleading periodic reports about the status of monies already deployed.

c.   Certain defendants caused Abraaj to convey to investors and potential investors materially inflated valuation and performance figures for various Abraaj funds. By fraudulently claiming that Abraaj funds were more successful than they were, these inflated valuations deprived investors of accurate (and often negative) information on which to base their investment